860 F.2d 1545
 57 USLW 2332
 Robyn Leroy PARKS, Petitioner-Appellant,
v.
John N. BROWN, Warden, Oklahoma State Penitentiary,
McAlester, Oklahoma; Larry Meachum, Superintendent,
Oklahoma Department of Corrections; and Michael C. Turpen,
Attorney General of Oklahoma, Respondents-Appellees.
 No. 86-1400.
 United States Court of Appeals,
Tenth Circuit.
 On Rehearing En Banc Oct. 28, 1988.
 
 Vivian Berger, New York City (Lewis Barber, Jr., Oklahoma City, Okl., with her on the brief), for petitioner-appellant.
 Robert A. Nance, Asst. Atty. Gen., Deputy Chief, Federal Div. (Robert H. Henry, Atty. Gen. of Oklahoma, with him on the brief), Oklahoma City, Okl., for respondents-appellees.
 Before HOLLOWAY, MCKAY, LOGAN, SEYMOUR, MOORE, ANDERSON, TACHA, BALDOCK, BRORBY and EBEL, Circuit Judges.
 
 
 1
 EBEL, Circuit Judge, delivers the opinion and judgment for the Court, in which LOGAN, JOHN P. MOORE, STEPHEN H. ANDERSON, TACHA, BALDOCK, and BRORBY, Circuit Judges, join as to Part I, and HOLLOWAY, Chief Judge, and McKAY, LOGAN, SEYMOUR, and MOORE, Circuit Judges, join as to Part II.
 
 
 2
 In 1978, an Oklahoma jury convicted petitioner-appellant, Robyn Leroy Parks, of first-degree murder and, after further hearing, sentenced him to death. After exhausting his state remedies, he sought and was denied habeas corpus relief in the United States District Court for the Western District of Oklahoma. He then appealed to this court, and a divided panel affirmed the district court. We agreed to a rehearing en banc on two of petitioner's arguments, and we now reverse his death sentence.
 
 
 3
 At petitioner's trial, the state established the following. Abdullah Ibrahim, a native of Bangladesh, worked part-time at a gas station in Oklahoma City, Oklahoma. On the morning of August 17, 1977, a motorist stopped at the gas station and found Ibrahim dead inside the station booth. Ibrahim died from a single gunshot wound in the chest from a .45-caliber pistol. The police found an unused gas credit card slip in the booth, with the license number "XZ-5710" written on it. The police traced this number to an automobile in which Parks had an interest.
 
 
 4
 An informant told police that Parks was involved in the murder and gave police an address at which Parks might be found. Although the police did not find Parks at that address, they found a car in the vicinity of the address with the license number "XZ-5710." Inside the car they found a prescription-drug bottle with Parks' name on it, a belt with the initials "R.L.P.," and eight .45-caliber bullets.
 
 
 5
 The police then talked with Parks' former roommate, James R. Clegg, Jr. After being offered a reward, Clegg allowed police to tape record two telephone conversations that he had with Parks, who was then in California. During the first conversation, Parks admitted to shooting the gas station attendant. Parks told Clegg that after he saw the attendant come out of the station booth and look at his license plate number, he was afraid that the attendant would call the police because he was using a stolen credit card to pay for the gas. He said that he was concerned about being stopped by the police because he had guns and dynamite in his car. During the second conversation, Parks told Clegg where he had hidden the murder weapon. At that location, police found a .45-caliber pistol and ammunition.
 
 
 6
 In the District Court of Oklahoma County, a jury found Parks guilty of the first-degree murder of Ibrahim. After further hearing, the same jury sentenced him to death. The jury found only one of the three statutory aggravating circumstances that were charged--that the murder was "committed for the purpose of avoiding or preventing a lawful arrest or prosecution." See 21 Okla.Stat. Sec. 701.12.[1] Parks' conviction and sentence were affirmed on direct appeal by the Oklahoma Court of Criminal Appeals. Parks v. State, 651 P.2d 686 (Okla.Crim.App.1982). The United States Supreme Court denied certiorari. Parks v. Oklahoma, 459 U.S. 1155, 103 S.Ct. 800, 74 L.Ed.2d 1003 (1983).
 
 
 7
 Parks subsequently sought post-conviction relief in the state courts of Oklahoma. The state district court denied relief, and the Oklahoma Court of Criminal Appeals affirmed in an unreported order and opinion. The United States Supreme Court again denied certiorari. Parks v. Oklahoma, 467 U.S. 1210, 104 S.Ct. 2400, 81 L.Ed.2d 356 (1984).
 
 
 8
 Parks then filed a petition for a writ of habeas corpus in the United States District Court for the Western District of Oklahoma. The district court denied relief, and Parks appealed to this court. A divided panel affirmed the district court's denial of habeas relief. Parks v. Brown, 840 F.2d 1496 (10th Cir.1987). This court agreed to a rehearing en banc, and we now reverse.
 
 
 9
 This rehearing focuses upon two basic issues, both arising from the penalty phase of petitioner's trial: (1) Whether the prosecutor's summation in the penalty phase concerning juror responsibility diverted the jury from considering the full extent of its responsibility for determining the life or death sentence, in violation of Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985); (2)[a] Whether the penalty phase instruction "You must avoid any influence of sympathy, sentiment, passion, prejudice or other arbitrary factor when imposing sentence," influenced the jury improperly to discount mitigating evidence presented by the defendant; and (2)[b] Whether the combination of the prosecutor's comments concerning the above instruction and the instruction itself, and the absence of any corrective instruction after the arguments, influenced the jury improperly to discount mitigating evidence presented by the defendant?[2]
 
 
 10
 As to the first issue, we hold that the prosecutor's remarks did not violate Caldwell by improperly reducing the jury's sense of its responsibility for the sentencing decision. Therefore, we affirm the district court on that issue. With respect to the second issue, we hold that the anti-sympathy portion of the jury instructions, even when viewed independently from the prosecutor's anti-sympathy remarks, violated the petitioner's eighth amendment rights by creating an impermissible risk of influencing the jury to discount mitigating evidence presented by him. Because we find the anti-sympathy instruction to be unconstitutional, we reverse the district court to the extent that it upheld the constitutionality of the death sentence in this case, and we remand for further proceedings consistent with this opinion.
 
 
 11
 We begin our analysis of petitioner's claims by noting the special nature of the death penalty. Because of its severity and irreversibility, the death sentence is the "ultimate restraint." Cartwright v. Maynard, 822 F.2d 1477, 1483 (10th Cir.1987) (en banc), aff'd, --- U.S. ----, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988). This qualitative difference from other punishments requires "a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case." Woodson v. North Carolina, 428 U.S. 280, 305, 96 S.Ct. 2978, 2991, 49 L.Ed.2d 944 (1976). See also Lockett v. Ohio, 438 U.S. 586, 604, 98 S.Ct. 2954, 2964, 57 L.Ed.2d 973 (1978). The Supreme Court has repeatedly stated that a high degree of scrutiny of the capital sentencing determination is required to ensure that the capital sentencing decision does not violate the eighth amendment prohibition against cruel and unusual punishments. See, e.g., California v. Ramos, 463 U.S. 992, 998-99, 103 S.Ct. 3446, 3451-52, 77 L.Ed.2d 1171 (1983). Accordingly, we apply a heightened scrutiny to the prosecutor's statements and jury instructions challenged in this rehearing.I.
 
 
 12
 THE PROSECUTOR'S COMMENTS REGARDING JURORS' RESPONSIBILITY
 
 
 13
 Petitioner argues that certain statements made by the prosecutor during the penalty phase of the trial violated the rule of Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985). The Supreme Court in Caldwell held that it is "constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." Id. at 328-29, 105 S.Ct. at 2639-40. In that case the Court found that it was improper for a prosecutor to have stated to the jury that its decision was "automatically reviewable by the Supreme Court" because, among other things, the statement carried with it "an intolerable danger that the jury will in fact choose to minimize the importance of its role." Id. at 333, 105 S.Ct. 2641.[3]
 
 
 14
 Here, petitioner challenges the following statements made by the prosecutor during the prosecutor's closing argument:
 
 
 15
 But, you know, as you as jurors, you really, in assessing the death penalty, you're not yourself putting Robyn Parks to death. You just have become a part of the criminal-justice system that says when anyone does this, that he must suffer death. So all you are doing is you're just following the law, and what the law says, and on your verdict--once your verdict comes back in, the law takes over. The law does all of these things, so it's not on your conscience. You're just part of the criminal-justice system that says that when this type of thing happens, that whoever does such a horrible, atrocious thing must suffer death.
 
 
 16
 Now that's man's law. But God's law is the very same. God's law says that the murderer shall suffer death. So don't let it bother your conscience, you know.
 
 
 17
 Record, vol. V, at 707-08.
 
 
 18
 Petitioner argues that those statements diluted the jurors' sense of responsibility for their decision in violation of Caldwell. Although we do not condone the statements made by the prosecutor, we find that the statements did not reduce the jury's sense of its actual responsibility for the sentencing decision and therefore did not violate Caldwell.
 
 
 19
 A two-step inquiry is appropriate when examining alleged Caldwell violations. See Darden v. Wainwright, 477 U.S. 168, 184 n. 15, 106 S.Ct. 2464, 2473 n. 15, 91 L.Ed.2d 144 (1986). First, the court should determine whether the challenged prosecutorial remarks are the type of statements covered by Caldwell. In other words, they must be statements that tend to shift the responsibility for the sentencing decision away from the jury. If so, the second inquiry is to evaluate the effect of such statements on the jury to determine whether the statements rendered the sentencing decision unconstitutional.
 
 
 20
 The Supreme Court elaborated upon Caldwell in Darden v. Wainwright, 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986), when it stated that Caldwell applies only to comments that "mislead the jury as to its role in the sentencing process in a way that allows the jury to feel less responsible than it should for the sentencing decision." Id. at 184 n. 15, 105 S.Ct. at 2473 n. 15 (emphasis added). Thus, Caldwell is triggered only by statements that dilute the jury's sense of its actual role in the sentencing process. Further, Caldwell may address only statements which mislead he jury as to its role, either by omission or commission.[4]
 
 
 21
 We conclude that Caldwell is inapplicable here because, as in Darden, "none of the [prosecutor's] comments could have had the effect of misleading the jury into thinking that it had a reduced role in the sentencing process." 477 U.S. at 184 n. 15, 106 S.Ct. at 2473 n. 15. However much the prosecutor in the instant case may have tried to diffuse the jury's moral responsibility for the death penalty, the actual role of the jury as the decision-making body that had the authority and responsibility to decide whether Robyn Parks should be sentenced to death was crystal clear.[5]
 
 
 22
 In evaluating the challenged statements, it is necessary to examine the context in which they were made. See Darden v. Wainwright, 477 U.S. 168, 179, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986); Dutton v. Brown, 812 F.2d 593, 596 (10th Cir.1987) (en banc), cert. denied, --- U.S. ----, 108 S.Ct. 116, 98 L.Ed.2d 74 (1987). An examination of other statements by the prosecutor and statements by defense counsel supports our conclusion that the jury's sense of its actual responsibility and authority for making the sentencing decision was not diminished.
 
 
 23
 During his initial closing argument at the penalty phase of the trial, the prosecutor emphasized that the jurors had the actual responsibility for deciding the appropriateness of the death penalty. For example, immediately after the statements challenged here by the petitioner, the prosecutor told the jury: "You consider all of this evidence ... Can you think of a more proper case--a more proper case in which your verdict assessing death would be more proper?" Record, vol. V, at 708. That statement made it clear to the jurors that they had the ultimate responsibility for evaluating the evidence and determining the appropriate sentence.
 
 
 24
 In his final closing argument, the prosecutor again stressed the gravity and importance of the jury's responsibility when he stated:
 
 
 25
 We are sorrowful that you do have a duty that you must perform, because you will remember this case, and you'll remember it the rest of your life, and you'll remember whether or not a horrible tragedy occurred and the man that did it sat before you.
 
 
 26
 ....
 
 
 27
 We must have the protection of the death penalty, and we must have jurors that are strong enough to say, when that kind of a case is laid in front of us, ... then we must, under the law and under the evidence, under a proper case, we must return the death penalty.
 
 
 28
 Record, vol. V, at 728-30.
 
 
 29
 Furthermore, defense counsel, in his closing argument, responded directly to the prosecutor's comments, thereby underscoring to the jury the full scope of its responsibility:
 
 
 30
 It seems to me that the situation that we've got here is that [the prosecutor is] trying to tell you that you've got three aggravating factors which could allow you to tell somebody down in McAlester to roll up Robyn Parks' sleeve and inject him with a barbiturate--a fast-acting paralytic agent--while strapped in a chair. They could allow you to do that; and under the law which I wrote,[6] they could. However, nothing in the law says you have to do it. You are the people who are going to determine whether it's done.
 
 
 31
 I heard [the prosecutor] say if anybody does this, he must suffer death. It's not true. It's not true at all.
 
 
 32
 Record, vol. V, at 709.
 
 
 33
 The defense counsel then proceeded to discuss the mitigating factors such as the petitioner's age, race and background. Record, vol. V, at 710. Thereafter, he reemphasized that not all first-degree murders are punishable by the death penalty and that "mandatory death penalties are unconstitutional." Record, vol. V, at 710-11. He then argued against the alleged aggravating circumstances. Record, vol. V, at 711-15.
 
 
 34
 After discussing the aggravating circumstances, defense counsel again emphasized that it was the jury's responsibility to determine the appropriate penalty:
 
 
 35
 I said, I'm not--by voting for this bill, I'm not prepared to throw the switch on anybody. The juries are the ones that are going to do that. The law doesn't require it, the legislature never required it, and I think for a good reason. What they did was, they gave it to the province of 12 people such as you to determine whether a man should live or a man should die, and they gave some guidelines to try to make that decision more rational and less emotional.
 
 
 36
 ....
 
 
 37
 ... But again, someone down in McAlester, hired by the state of Oklahoma, is going to have to inject a lethal substance into Robyn Leroy Parks to cause his death, if you do decide, and that responsibility is on each and every one of you.
 
 
 38
 Record, vol. V, at 716, 720-21.
 
 
 39
 Similarly, the judge, in his instructions, emphasized to the jury that it had the responsibility to determine what penalty should be given to the petitioner Parks. The jury was instructed: "It is now your duty to determine the penalty which shall be imposed for this offense." Penalty Instruction No. 3. Unlke Caldwell, in which the trial court compounded the sense of dilution of responsibility that had been conveyed by the prosecutor to the jury, here the judge's instructions were clear and unequivocal that the sentencing responsibility rested with this jury.
 
 
 40
 Other decisions of this court and other courts of appeals are instructive on the scope of Caldwell and its applicability to the statements made by the prosecutor in this case. In Dutton v. Brown, 812 F.2d 593 (10th Cir.1987) (en banc), cert. denied, --- U.S. ----, 108 S.Ct. 116, 98 L.Ed.2d 74 (1987), this court rejected a Caldwell challenge to statements similar to the ones challenged here. In Dutton, the prosecutor told the jurors that they were "part of the process" and were "not functioning as individuals." Id. at 596.[7] This court held that "when taken in context, the statement of the prosecutor was not constitutionally impermissible." Id. at 596-97. Rather, the statement "merely underscored that the jury was part of the whole system of justice." Id. at 597.
 
 
 41
 In Coleman v. Brown, 802 F.2d 1227 (10th Cir.1986), cert. denied, --- U.S. ----, 107 S.Ct. 2491, 96 L.Ed.2d 383 (1987), the prosecutor told the jury that it was "not writing the verdict" because the defendant, not the jury, was responsible for the defendant's plight. We concluded in Coleman that the defendant's rights were not violated:
 
 
 42
 [T]he dangers the Court identified in Caldwell are not present in the remarks made here. This method of argument does not permit the jury to rely on someone else to make the ultimate sentencing decision or otherwise dilute or trivialize the jury's responsibility. Unlike the argument in Caldwell, the argument used here did not suggest to the jury that someone else now has control over the defendant's fate.
 
 
 43
 Id. at 1240-41 (emphasis in original).
 
 
 44
 Several other circuits have rejected Caldwell challenges to prosecutorial statements that were more egregious than the ones in this case and while we have no occasion to approve or disapprove of those holdings, they do show how other circuits have read Caldwell. See, e.g., Sawyer v. Butler, 848 F.2d 582, 595 (5th Cir.1988) (jury was told that "there will be others who will be behind you to either agree with you or to say you are wrong"), reh'g granted, (available on Westlaw), 1988 U.S.App. Lexis 12690; Stewart v. Dugger, 847 F.2d 1486, 1489-93 (11th Cir.1988) (judge told jury that "this is one of those cases where the legislature has said that the death penalty is the appropriate penalty" and prosecutor informed the jury of its advisory role); Harich v. Dugger, 844 F.2d 1464, 1472-75 (11th Cir.1988) (en banc) (advisory jury was told that its sentence was only a recommendation and that the court would make the final decision). Our research reveals that the circuit court decisions that have invalidated sentencing decisions under Caldwell involved prosecutorial remarks that clearly shifted the ultimate sentencing authority away from the jury. See, e.g., Mann v. Dugger, 844 F.2d 1446 (11th Cir.1988) (jury was told that its decision was only an "advisory" recommendation and that the sentencing decision was not on its shoulders); Wheat v. Thigpen, 793 F.2d 621, 628-29 (5th Cir.1986) (jury was told that a death penalty decision would not be final and if the jury made a mistake a reviewing court would send the case back), cert. denied, 480 U.S. 930, 107 S.Ct. 1566, 94 L.Ed.2d 759 (1987).
 
 
 45
 Upon viewing the prosecutor's statements in context, we conclude that they did not unconstitutionally diminish the jurors' sense of authority and responsibility for the sentencing decision. Although the prosecutor may have sought to use the challenged remarks to comfort the jury that it was applying standards reflecting societal values, the remarks did not reduce the jury's sense of actual responsibility and authority for determining the appropriate penalty. We read Caldwell as prohibiting only the latter kind of statements, and, accordingly, we hold that the challenged prosecutor's remarks did not violate Caldwell.
 
 II.
 
 46
 ANTI-SYMPATHY INSTRUCTION AND PROSECUTOR'S STATEMENTS
 
 REGARDING SYMPATHY
 A. The Anti-Sympathy Instruction
 
 47
 Petitioner contends that the anti-sympathy instruction at the penalty phase of his trial violated his eighth amendment rights. The instruction provided, in pertinent part: "You must avoid any influence of sympathy, sentiment, passion, prejudice or other arbitrary factor when imposing sentence."[8] Petitioner challenges only the "sympathy" portion of the instruction. He argues that it constitutes constitutional error because it undermined the jury's consideration of mitigating evidence.
 
 
 48
 In evaluating this alleged constitutional error, we are mindful of the standard of review of jury instructions in the sentencing phase of a capital trial. Initially, a reviewing court should determine how a reasonable juror could construe the instruction. Francis v. Franklin, 471 U.S. 307, 315-16, 105 S.Ct. 1965, 1971-72, 85 L.Ed.2d 344 (1985); California v. Brown, 479 U.S. 538, 541, 107 S.Ct. 837, 839, 93 L.Ed.2d 934 (1987). If there is a "substantial possibility" that a reasonable juror could construe the instruction in such a way as to make its sentencing decision improper, the court should reverse the sentencing decision. Mills v. Maryland, --- U.S. ----, 108 S.Ct. 1860, 1867, 100 L.Ed.2d 384 (1988). We conclude in this case, as the Supreme Court did in Mills, that "[t]he possibility that petitioner's jury conducted its task improperly certainly is great enough to require resentencing." 108 S.Ct. at 1870.
 
 
 49
 The Supreme Court confronted a similar, although not identical, jury instruction in California v. Brown, 479 U.S. 538, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987). In that case the trial judge instructed the jury that it must not be swayed by "mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling." Id. at 542, 107 S.Ct. at 840. As in this case, the defendant challenged the "sympathy" portion of the instruction, arguing that it interfered with the jury's consideration of mitigating evidence. The Court, in a five to four decision, upheld the instruction, principally relying upon the word "mere" that modified the word "sympathy" in the instruction. The Court stated, "By concentrating on the noun 'sympathy,' respondent ignores the crucial fact that the jury was instructed to avoid basing its decision on mere sympathy." Id. (emphasis in original). The Court concluded that a reasonable juror would "understand the instruction not to rely on 'mere sympathy' as a directive to ignore only the sort of sympathy that would be totally divorced from the evidence adduced during the penalty phase." Id.
 
 
 50
 The anti-sympathy instruction before us is not modified by the word "mere," which the Court in Brown considered "crucial" to its decision to uphold the instruction. Rather, the instruction in this case commands the jury to disregard "any" influence of sympathy.[9] Therefore, unlike the instruction in Brown, this all-inclusive anti-sympathy instruction carries with it the danger of leading the jury to ignore sympathy that is based on the mitigating evidence. Consequently, it cannot receive the saving interpretation given in Brown that the jury should exclude only "the sort of sympathy that would be totally divorced from the evidence." The Court in Brown, by stressing that the instruction there reasonably could be construed as precluding only "extraneous emotional factors" that were "totally divorced from the evidence," id., implicitly suggested that sympathy that is based on the evidence is a valid consideration in sentencing that cannot constitutionally be precluded.[10]
 
 
 51
 Besides emphasizing the word "mere," the Court in Brown also stated that it was "highly unlikely" that a juror would single out the word "sympathy" in that instruction, which precluded the jury from considering sentiment, conjecture, passion, prejudice, public opinion or public feeling in addition to sympathy. Id. at 542-43, 107 S.Ct. at 840-41. The Court reasoned that a rational juror would read the instruction as a whole and conclude that it was a general command to confine the juror's deliberation to "considerations arising from the evidence presented." Id. at 543, 107 S.Ct. at 840.[11] However plausible such an interpretation may be for the phrase "mere sympathy," we do not think it can be given to the phrase "any influence of sympathy" which, by its inclusive terms, must include sympathy "arising from the evidence presented" as well as sympathy unconnected to the evidence.
 
 
 52
 In any event, we do not believe that the inclusion of the word sympathy in a list of obviously improper factors reduced the unconstitutional effect of the instruction in this case. In fact, it is likely that including the word sympathy with factors such as prejudice only served to denigrate it and to underscore its impermissibility. That conclusion is buttressed by the phrase "or any other arbitrary factor" at the end of the sentence, which suggests that sympathy is an arbitrary factor which should not be relied upon. Further, although the word "sympathy" was buried in the middle of seven factors in Brown, in this case it was first on the list of only four impermissible factors and it was preceded by the adjective "any." Therefore, it is more likely in this case that a juror would notice and be affected by the anti-sympathy portion of the instruction.
 
 
 53
 Four justices in Brown dissented. 479 U.S. at 547-63, 107 S.Ct. at 842-51. Because those justices argued in Brown that a "mere sympathy" instruction was unconstitutional, we believe that, a fortiori, they would find an absolute anti-sympathy instruction to be improper.
 
 
 54
 Justice O'Connor, in a separate concurring opinion, provided the fifth vote for upholding the "mere sympathy" instruction in Brown. In her opinion, however, she expressed concern about the instruction, and she observed that a danger with "attempts to remove emotion from capital sentencing" is that such attempts may mislead jurors "into believing that mitigating evidence about a defendant's background or character also must be ignored." Brown, 479 U.S. at 545-46, 107 S.Ct. at 841-42 (O'Connor, J., concurring). It is that concern that we now address.
 
 
 55
 The capital defendant's constitutional right to present and have the jury consider mitigating evidence during the capital phase of the trial is very broad. The Supreme Court has held that "the Eighth and Fourteenth Amendments require that the sentencer ... not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less then death." Lockett v. Ohio, 438 U.S. 586, 604, 98 S.Ct. 2954, 2964, 57 L.Ed.2d 973 (1978) (emphasis in original). See also Woodson v. North Carolina, 428 U.S. 280, 304, 96 S.Ct. 2978, 2991, 49 L.Ed.2d 944 (1976).
 
 
 56
 The sentencer must give "individualized" consideration to the mitigating circumstances surrounding the defendant and the crime, Brown, 479 U.S. at 541, 107 S.Ct. at 839; Zant v. Stephens, 462 U.S. 862, 879, 103 S.Ct. 2733, 2744, 77 L.Ed.2d 235 (1983); Eddings v. Oklahoma, 455 U.S. 104, 111-12, 102 S.Ct. 869, 874-76, 71 L.Ed.2d 1 (1982); Lockett, 438 U.S. at 605, 98 S.Ct. at 2965, and may not be precluded from considering "any relevant mitigating evidence." Eddings, 455 U.S. at 114, 102 S.Ct. at 877. See also Andrews v. Shulsen, 802 F.2d 1256, 1261 (10th Cir.1986), cert. denied, --- U.S. ----, 107 S.Ct. 1964, 95 L.Ed.2d 536 (1987).
 
 
 57
 Mitigating evidence about a defendant's background or character is not limited to evidence of guilt or innocence, nor does it necessarily go to the circumstances of the offense. Rather, it can include an individualized appeal for compassion, understanding, and mercy as the personality of the defendant is fleshed out and the jury is given an opportunity to understand, and to relate to, the defendant in normal human terms. A long line of Supreme court cases shows that a capital defendant has a constitutional right to make, and have the jury consider, just such an appeal.
 
 
 58
 In Gregg v. Georgia, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), the Court upheld the Georgia sentencing scheme which allowed jurors to consider mercy in deciding whether to impose the penalty of death. Id. at 203, 96 S.Ct. at 2939. The Court stated that "[n]othing in any of our cases suggests that the decision to afford an individual defendant mercy violates the Constitution." Id. at 199, 96 S.Ct. at 2937.
 
 
 59
 In Woodson v. North Carolina, 428 U.S. 280, 304, 96 S.Ct. 2978, 2991, 49 L.Ed.2d 944 (1976), the Court struck down mandatory death sentences as incompatible with the required individualized treatment of defendants. A plurality of the Court stated that mandatory death penalties treated defendants "not as uniquely individual human beings but as members of a faceless, undifferentiated mass to be subjected to the blind infliction of the death penalty." Id. at 304, 96 S.Ct. at 2991. The Court held that "the fundamental respect for humanity underlying the Eighth Amendment ... requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death." Id. The Court explained that mitigating evidence is allowed during the sentencing phase of a capital trial in order to provide for the consideration of "compassionate or mitigating factors stemming from the diverse frailties of humankind." Id.
 
 
 60
 In Eddings v. Oklahoma, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982), the Court reviewed a sentencing judge's refusal to consider evidence of a defendant's troubled family background and emotional problems. In reversing the imposition of the death penalty, the Court held that "[j]ust as the State may not by statute preclude the sentencer from considering any mitigating factor, neither may the sentencer refuse to consider, as a matter of law, any relevant mitigating evidence." Id. at 113-14, 102 S.Ct. at 876-77 (emphasis in original). The Court stated that although the system of capital punishment should be "consistent and principled," it must also be "humane and sensible to the uniqueness of the individual." Id. at 110, 102 S.Ct. at 874.
 
 
 61
 In Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), the Court held that an attempt to shift sentencing responsibility from the jury to an appellate court was unconstitutional, in part, because the appellate court is ill equipped to consider "the mercy plea [which] is made directly to the jury." Id. at 330-31, 105 S.Ct. at 2640-41. The Court explained that appellate courts are unable to "confront and examine the individuality of the defendant" because "[w]hatever intangibles a jury might consider in its sentencing determination, few can be gleaned from an appellate record." Id.
 
 
 62
 In Skipper v. South Carolina, 476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986), the trial court had precluded the defendant from introducing evidence of his good behavior while in prison awaiting trial. The Court held that the petitioner had a constitutional right to introduce the evidence, even though the evidence did not relate to his culpability for the crime. Id. at 4-5, 106 S.Ct. at 1670-71. The Court found that excluding the evidence "impeded the sentencing jury's ability to carry out its task of considering all relevant facets of the character and record of the individual offender." Id. at 8, 106 S.Ct. at 1673.
 
 
 63
 "Mercy," "humane" treatment, "compassion," and consideration of the unique "humanity" of the defendant, which have all been affirmed as relevant considerations in the penalty phase of a capital case, all inevitably involve sympathy or are sufficiently intertwined with sympathy that they cannot be parsed without significant risk of confusion in the mind of a reasonable juror. Webster's Third International Dictionary (Unabridged ed. 1966) describes "mercy" as "a compassion or forbearance shown to an offender," and "a kindly refraining from inflicting punishment or pain, often a refraining brought about by a genuinely felt compassion and sympathy." Id. at 1413 (emphasis added). The word "humane" similarly is defined as "marked by compassion, sympathy, or consideration for other human beings." Id. at 1100 (emphasis added). Webster's definition of "compassion" is a "deep feeling for and understanding of misery or suffering," and it specifically states that "sympathy" is a synonym of compassion. Id. at 462. Furthermore, it defines "compassionate" as "marked by ... a ready inclination to pity, sympathy, or tenderness." Id. (emphasis added).
 
 
 64
 Without placing an undue technical emphasis on definitions, it seems to us that sympathy is likely to be perceived by a reasonable juror as an essential or important ingredient of, if not a synonym for, "mercy," "humane" treatment, "compassion," and a full "individualized" consideration of the "humanity" of the defendant and his "character." Therefore, the instruction that absolutely precluded the jury from considering any sympathy for Robyn Parks improperly undermined the jury's ability to consider fully petitioner's mitigating evidence. Furthermore, if a juror is precluded from responding with sympathy to the defendant's mitigating evidence of his own unique humanness, then there is an unconstitutional danger that his counsel's plea for mercy and compassion will fall on deaf ears.
 
 
 65
 Here, the petitioner did offer mitigating evidence about his background and character. Petitioner's father testified that petitioner was a "happy-go-lucky guy" who was "friendly with everybody." The father also testified that, unlike other people in the neighborhood, petitioner avoided violence and fighting; that he (the father) was in the penitentiary during the petitioner's early childhood; that petitioner was the product of a broken home; and that petitioner only lived with him from about age 14 to 19. Although the father admitted that petitioner once was involved in an altercation at school, he suggested that it was a result of the difficulties of attending a school with forced bussing. Record, vol. V, at 667-82.
 
 
 66
 Petitioner's counsel, in his closing argument, then relied on this testimony to argue that petitioner's youth, race, school experiences, and broken home were mitigating factors that the jury should consider in making its sentencing decision. In so doing, defense counsel appealed directly to the jury's sense of compassion, understanding, and sympathy, and asked the jury to show "kindness" to his client as a result of his background. Record, vol. V, at 708-723. We find that the anti-sympathy instruction created an impermissible risk that the jury did not fully consider these mitigating factors in making its sentencing decision.
 
 
 67
 Once we have determined that the challenged jury instruction is constitutionally defective, we then look to the full set of instructions as a whole "to see if the entire charge delivered a correct interpretation of the law." Brown, 479 U.S. at 541, 107 S.Ct. at 839. Our review of other relevant instructions from the penalty phase of the trial reveals that they did not remedy the unconstitutional effect of the anti-sympathy instruction.
 
 
 68
 The only instruction which could have conceivably remedied the anti-sympathy instruction is Instruction No. 6, which explained the jury's duty regarding mitigating circumstances. The instruction explained to the jury that it was to consider certain enumerated mitigating circumstances such as lack of prior criminal activity, duress, and the age of the petitioner, along with "any other or additional mitigating circumstances, if any, that you may find from the evidence to exist in this case." It also advised them that "[w]hat facts or evidence that may constitute an additional mitigating circumstance is for the jury to determine."Although the jury was instructed that it had the duty to consider all relevant mitigating evidence, it was also commanded to "avoid any influence of sympathy" when considering that evidence. Penalty Instruction No. 9. As we discussed above, sympathy may be an important ingredient in understanding and appreciating mitigating evidence of a defendant's background and character. Thus, at best, the jury received conflicting instructions. Although it is possible that the jury could have read the instructions in such a way as to override the absolute anti-sympathy instruction, it is equally possible that the jury felt constrained in its ability to consider the mitigating evidence because of the absolute bar to its ability to consider sympathy. As the Supreme Court stated in Francis v. Franklin, 471 U.S. 307, 322, 105 S.Ct. 1965, 1975, 85 L.Ed.2d 344 (1985), "[l]anguage that merely contradicts and does not explain a constitutionally infirm instruction will not suffice to absolve the infirmity. A reviewing court has no way of knowing which of the two irreconcilable instructions the jurors applied in reaching their verdict." Because we cannot "rule out the substantial possibility that the jury may have rested its verdict on the 'improper' ground," Mills, 108 S.Ct. at 1867, we must remand for resentencing.
 
 
 69
 Respondent argues that the jury was aware of its responsibility to consider and weigh both the aggravating and mitigating evidence. Respondent points out that the prosecutor repeatedly reminded the jurors of this duty. Indeed, during his first closing argument in the penalty phase of the trial, the prosecutor stated:
 
 
 70
 Now before you would be authorized to even think about giving the death penalty, you must find that one of the aggravating circumstances existed:
 
 
 71
 ....
 
 
 72
 ... Now once you've found at least one, then you must go, under the law, over to the mitigating.
 
 
 73
 ....
 
 
 74
 And, now the court also tells you, you can consider anything else that you want to, to mitigate the penalty of death and the term of life. You can consider anything you want to in addition to what he's told you ... "and determine whether one or more of them apply to all the evidence, facts and circumstances of this case." In other words, whether or not you feel like that these mitigating circumstances are so strong in favor of the Defendant that it's just going to eliminate and do away with the aggravating circumstances.
 
 
 75
 Record, vol. V, at 696-704.
 
 
 76
 Respondent argues that these statements eliminated any unconstitutional effect of the anti-sympathy instruction. We disagree. First, a prosecutor's statements are not sufficiently authoritative in the minds of jurors to override an unconstitutional instruction from the judge. Second, although the prosecutor told the jury to consider mitigating evidence, he also told them not to consider it in the most natural and significant way that they could do so--that is, with sympathy. Thus, at best, the prosecutor gave the jurors conflicting signals which could have confused them and interfered with their consideration of the mitigating evidence. Third, the prosecutor's statements, taken as a whole, served only to exacerbate the error of the anti-sympathy instruction rather than to ameliorate that error. See "B. The Prosecutor's Remarks Regarding Sympathy," infra.
 
 
 77
 Respondent also argues that sympathy is not a constitutionally protected mitigating factor. That argument misconstrues the issue. The issue is not whether unbridled sympathy itself is a proper mitigating factor. Rather, the issue is whether an absolute anti-sympathy instruction presents an impermissible danger of interfering with the jury's consideration of proper mitigating evidence. We hold that it does.[12] The Supreme Court has made it clear that such a risk is "unacceptable and incompatible with the commands of the Eighth and Fourteenth Amendments." Lockett, 438 U.S. at 605, 98 S.Ct. at 2965.
 
 
 78
 Respondent also contends that the instruction is properly aimed at removing emotion and thus arbitrariness from the sentencing decision. Although we agree that untethered emotion should not be the basis of a sentencing decision, see Gregg v. Georgia, 428 U.S. 153, 189, 96 S.Ct. 2909, 2932, 49 L.Ed.2d 859 (1976), we hold that an instruction that directs the jury to disregard any influence of sympathy, including sympathy for the defendant based on the mitigating evidence, sweeps too broadly.[13]
 
 
 79
 Additionally, respondent asserts that the jury should not be allowed to consider sympathy for the petitioner because the prosecutor is precluded from introducing a victim impact statement which would allow the prosecutor to use sympathy for the victim as an aid in securing the death penalty. See Booth v. Maryland, 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987). In Booth the Supreme Court invalidated a Maryland statute that required the introduction of a victim impact statement at the sentencing stage of a capital murder trial, holding that the statute violated the eighth amendment. We reject respondent's argument that Booth stands for the proposition that all sympathy must be eliminated from the jury's decisionmaking. Instead, we read Booth as holding only that the information in a victim impact statement, as distinguished from the background of the defendant, is irrelevant to the issues to be considered at the penalty phase of a capital case and that the potential for passion and prejudice from those statements is such that they may not be introduced. By contrast, the Supreme Court has made it clear many times that the defendant is entitled to present evidence of his character and background at the sentencing phase of his capital trial. Compare Eddings, supra, with Booth, supra.
 
 
 80
 B. The Prosecutor's Remarks Regarding Sympathy
 
 
 81
 Besides the anti-sympathy instruction, petitioner claims that the prosecutor's remarks regarding sympathy were improper and added to the constitutional violation. Because we find that the anti-sympathy instruction alone violated petitioner's constitutional rights, we need not reach the prosecutor's statements to reverse the penalty decision. Nevertheless, we do find the prosecutor's statements illustrative of the risk that the trial court's anti-sympathy instruction created--a risk that the jury will rely on such an instruction to disregard proper mitigating evidence.
 
 
 82
 Petitioner, during the penalty phase of his trial, introduced testimony from his father that addressed factors in the petitioner's childhood that were designed to explain to the jury why he might have acted as he did, and to evoke some sympathy and understanding for the petitioner as an individual human being. There is no question that introduction of that evidence was proper. However, long before that evidence was ever introduced the prosecutor had begun to lay the foundation for his argument that it should be disregarded. During voir dire, the prosecutor stated to the jury:
 
 
 83
 Of course the court will instruct you that you should not allow sympathy, sentiment or prejudice to enter into your deliberations. And frankly, that's just as cold-blooded as you can put it.
 
 
 84
 ... [Y]ou can be as sympathetic as you want to or you can be as prejudiced as you want to be, but you can't do it and sit on this jury. So, that's just a real simple way that Judge Cannon put it to you.
 
 
 85
 You cannot allow your sympathy, sentiment or prejudice to influence you in this case and sit on this jury. And now is the time for us to find out if you will eliminate any sympathy, sentiment or prejudice in this case. Will all of you do that?
 
 
 86
 Record, vol. I, at 86-87.
 
 
 87
 After the petitioner put on his mitigating evidence, the prosecutor, in his closing argument during the penalty phase of the trial, argued to the jury that the mitigating evidence and defense counsel's summation of such evidence was nothing more than an appeal to sympathy and accordingly should be disregarded. The prosecutor stated:
 
 
 88
 His [the defense counsel's] closing arguments are really a pitch to you for sympathy--sympathy, or sentiment or prejudice; and you told me in voir dire you wouldn't do that.
 
 
 89
 Well, it's just cold turkey. He either did it or he didn't. He either deserves the death penalty or he doesn't, you know. You leave the sympathy, and the sentiment and prejudice part out of it.
 
 
 90
 Record, vol. V, at 725-26.
 
 
 91
 Thus, the prosecutor relied on the anti-sympathy instruction to overcome the defense counsel's arguments regarding mitigation and mercy.[14] The prosecutor's use of the instruction demonstrates how a general anti-sympathy instruction may be used to reduce improperly the jury's consideration of mitigating circumstances.
 
 
 92
 Because we find that an instruction that absolutely precludes any consideration of sympathy creates an impermissible risk that a reasonable juror might disregard mitigating evidence, we hold that the general anti-sympathy instruction in this case violated petitioner's eighth amendment rights. Although we affirm the district court's denial of the writ of habeas corpus, we hold that petitioner's death sentence is invalid and must be vacated, and we enjoin petitioner's execution under this invalid sentence.[15] Accordingly, we reverse the district court to the extent that it sustained the death penalty and we remand for further proceedings consistent with this opinion.[16]
 
 
 93
 REVERSED AND REMANDED.
 
 
 94
 HOLLOWAY, Chief Judge, with whom McKAY and SEYMOUR, Circuit Judges, join, concurring and dissenting:
 
 
 95
 I concur fully in the persuasive analysis in Judge Ebel's opinion with respect to Part II on the anti-sympathy instruction, and in the disposition in his opinion holding unconstitutional the death penalty in this case. I respectfully dissent from the conclusion and analysis in Part I of Judge Ebel's opinion concerning the Caldwell issue. For this reason I join in the opinion of Judge McKay and agree fully with his view that there was a Caldwell violation here under the Supreme Court's standard expressed there that "we cannot say that this effort [minimizing the sentencing jury's responsibility] had no effect on the sentencing decision ..." (quoting Caldwell, 472 U.S. at 341, 105 S.Ct. at 2646).
 
 
 96
 Judge McKay has convincingly explained his conclusion that there was a Caldwell violation requiring invalidation of this death penalty. In addition to his forceful reasoning, I note that the concerns of Caldwell apply in the circumstances of this trial under Oklahoma criminal procedure with special force. The prosecutor's arguments under the Oklahoma procedure followed the instructions to the jury at the penalty phase. Under 22 O.S.A. Sec. 831(5) and (6), instructions are given to the jury before the argument by counsel; then counsel for the State commences, defense counsel then argues, and counsel for the State concludes the argument to the jury. When the arguments are concluded, if the court is of the opinion that the jury might be misled by the arguments of counsel, the judge may further instruct the jury to prevent such misunderstanding. 22 O.S.A. Sec. 831(6).
 
 
 97
 Here the procedure outlined above was followed as to the sequence of instructions and subsequent arguments, but the trial court did not elect to give any further instructions on the law to avoid any misleading. There was a supplemental instruction in response to a question about the verdict form, but there was none concerning the jury's responsibility on the life-or-death decision. The record shows no objection or request by defense counsel for such an instruction; nevertheless the damaging effect of the arguments on the jury's perception of its responsibility was fundamental and cannot be dismissed. See Caldwell, 472 U.S. at 334 n. 4, 105 S.Ct. at 2642 n. 4 (citing Hawes v. State, 240 Ga. 327, 333, 240 S.E.2d 833, 839 (1977) (setting aside death sentence in spite of counsel's failure to object to prosecutor's argument)).
 
 
 98
 The prejudicial arguments of the prosecutor here to the jury on its function followed all of the trial judge's instructions on the jury's responsibility in deciding whether to impose the death penalty.[1] The lack of any corrective instruction to the jurors on their responsibility is a factor of special concern. The importance of such corrective instructions after jury dilution remarks has been emphasized by two courts of appeals in post-Caldwell decisions. See Harich v. Wainwright, 813 F.2d 1082, 1095 (11th Cir.1987); Tucker v. Kemp, 802 F.2d 1293, 1296-97 (11th Cir.1986), cert. denied, 480 U.S. 911, 107 S.Ct. 1359, 94 L.Ed.2d 529 (1987); Celestine v. Butler, 823 F.2d 74, 78-79 (5th Cir.), cert. denied, --- U.S. ----, 108 S.Ct. 6, 97 L.Ed.2d 796 (1987); see also Donnelly v. DeCristoforo, 416 U.S. 637, 641, 644, 94 S.Ct. 1868, 1870, 1872, 40 L.Ed.2d 431 (1974) (corrective charge was given after improper prosecutorial argument).
 
 
 99
 Accordingly, I join in the view of Judge McKay that there was a Caldwell violation which itself requires invalidation of this death penalty, while agreeing fully with Judge Ebel's opinion that there was a violation of California v. Brown and his disposition of this habeas appeal.
 
 
 100
 McKAY, Circuit Judge, concurring in part and dissenting in part, in which HOLLOWAY, Chief Judge, and SEYMOUR, Circuit Judge, join:
 
 
 101
 While I concur in part II of the majority's opinion, the decision on the jury responsibility issue raised in part I compels me to dissent in this death penalty case.
 
 
 102
 The murder committed by Robyn Parks was, as all murders are, a personal tragedy for the victim's family and an affront to society's moral sensibilities. At common law, every convicted murderer was sentenced to death. Throughout the development of modern death penalty jurisprudence, however, the Supreme Court has made clear that capital punishment is constitutionally limited to those rare murders involving heinous, outrageous, or gruesome killings.
 
 
 103
 The Supreme Court rejected the notion that our "standards of decency had evolved to the point where capital punishment no longer could be tolerated," Gregg v. Georgia, 428 U.S. 153, 179, 96 S.Ct. 2909, 2928, 49 L.Ed.2d 859 (1976), but at the same time recognized that the capital sentencing process must be tailored in order to avoid arbitrary and capricious imposition of the death penalty based on irrelevant biases and prejudices. In order to resolve this conflict, the Supreme Court has limited imposition of the death penalty by narrowing the class of murders to which the penalty applies and by vesting the jury with carefully guided discretion in the sentencing phase of a capital murder trial. See Eddings v. Oklahoma, 455 U.S. 104, 110-11, 102 S.Ct. 869, 874-75, 71 L.Ed.2d 1 (1982), and Gregg, 428 U.S. at 176-79, 96 S.Ct. at 2926-28.
 
 
 104
 The Supreme Court's severe narrowing of cases in which the death penalty meets eighth amendment standards reflects society's evolving standards of decency and "the humane feeling that this most irrevocable of sanctions should be reserved for a small number of extreme cases." Gregg, 428 U.S. at 182, 96 S.Ct. at 2929. The decision to impose the death penalty in a particular murder case properly turns on such issues as the depravity of the murder (e.g., whether the defendant tortured his victim or inflicted multiple or hideous wounds) and the demonstrated violent propensities of the defendant. These are the factors which differentiate those "routine murder case[s]," Jackson v. Virginia, 443 U.S. 307, 328, 99 S.Ct. 2781, 2794, 61 L.Ed.2d 560 (1979) (Stevens, J., concurring) that cannot justify the imposition of the death penalty from those far fewer murder cases that do.
 
 I.
 
 105
 The critical standard of review in death penalty cases is the Supreme Court's most recent pronouncement on the subject in Mills v. Maryland, --- U.S. ----, 108 S.Ct. 1860, 1870, 100 L.Ed.2d 384 (1988):
 
 
 106
 The decision to exercise the power of the State to execute a defendant is unlike any other decision citizens and public officials are called upon to make. Evolving standards of societal decency have imposed a correspondingly high requirement of reliability on the determination that death is the appropriate penalty in a particular case. The possibility that petitioner's jury conducted its task improperly certainly is great enough to require resentencing. (emphasis added)
 
 
 107
 Stated in the context of this case, in order to sustain the death penalty we must determine that the prosecutor's effort to reduce the jury's sense of responsibility had "no effect on the sentencing decision." Caldwell v. Mississippi, 472 U.S. 320, 341, 105 S.Ct. 2633, 2646, 86 L.Ed.2d 231 (1985). In this case, Mr. Parks attempted to purchase gasoline with a stolen credit card and shot the victim once in the chest when he discovered the victim copying his license plate number. There was no evidence of torture, multiple wounds, or premeditation on the part of Mr. Parks. His only prior conviction was as a juvenile involved in a schoolyard scuffle. Under the facts of this ordinary murder case,[1] the jury's imposition of the death penalty strongly suggests that it "conducted its task improperly" and its verdict may have been a product of the jurors' misapprehension of its proper role in the sentencing process.
 
 
 108
 When the jury addressed aggravating circumstances, it did not find that this murder was "especially heinous, atrocious or cruel." Maj. op. at 1547, fn. 1. However, it did find that the murder was "committed for the purpose of avoiding or preventing a lawful arrest or prosecution," 21 Okla.Stat. Sec. 701.12. Certainly that circumstance alone does not clearly settle this murder into one of the "extreme cases" envisioned by Gregg. In my mind, even if this aggravating circumstance, standing alone, is constitutionally sufficient to sweep an ordinary murder like this one into the class of extreme cases appropriate for capital punishment, the jury's decision to impose the death penalty in this case warrants the special scrutiny dictated by Mills. Special scrutiny is necessary in order to ensure that the jury was not improperly guided in its decision-making process. The imposition of the death penalty in this case is disquieting because it at least appears to be a case in which the death penalty is inappropriate under the clear dichotomy drawn by the Supreme Court between the great majority of murders and those in which capital punishment is constitutionally permissible.
 
 II.
 
 109
 In death penalty cases, the Court should exercise the greatest caution when applying principles of law which affect the delicate balance between jury guidance and discretion in the capital sentencing process. A prosecutor's remarks regarding jury responsibility and the remarks and instructions of a trial court, or lack thereof, in response to her remarks can be critical in the jury's capital sentencing determination. Therefore, the prosecutor's remarks, if impermissible, increase the likelihood that the jury's verdict rests upon improper grounds.
 
 
 110
 In general, many issues which arise in a jury trial are well within the competence of jurors: for example, weighing evidence, discounting counsel's remarks if she overargues her case, observing the demeanor and truthfulness of witnesses, distinguishing between acceptable and unacceptable hearsay, and ultimately comprehending the simplicity or complexity of a case before them. Where capital sentencing is concerned, however,
 
 
 111
 [s]ince the members of a jury will have had little, if any, previous experience in sentencing, they are unlikely to be skilled in dealing with the [aggravating and mitigating] information they are given.... It is quite simply a hallmark of our legal system that juries be carefully and adequately guided in their deliberations.
 
 
 112
 Gregg, 428 U.S. at 192-93, 96 S.Ct. at 2934-35.
 
 
 113
 The problem of juror inexperience is particularly acute in matters bearing upon the procedural allocation of functions and responsibilities between the court and the jury.[2] It is in these matters that the jurors are most likely to look to the court for guidance and to rely on what the prosecutor tells them or what the court tells or fails to tell them. Direction by the state in the person of the prosecutor, and instructions from the court, or lack thereof, regarding jury responsibility in sentencing are especially likely to influence the jury's decision-making process.
 
 III.
 
 114
 Under the Mills standard, the prosecutor's remarks in this case, which were not corrected contemporaneously by the court, violated the principles articulated in Caldwell, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231. The Caldwell court held that "it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." Id. at 328-29, 105 S.Ct. at 2639-40. This delegation of a jury's sentencing responsibility "presents an intolerable danger of bias toward a death sentence." Id. at 331, 105 S.Ct. at 2640.
 
 
 115
 The Supreme Court recently interpreted Caldwell to prohibit those comments "that mislead the jury as to its role in the sentencing process in a way that allows the jury to feel less responsible than it should for the sentencing decision." Darden v. Wainwright, 477 U.S. 168, 106 S.Ct. 2464, 2473 n. 15, 91 L.Ed.2d 144 (1986) (emphasis added). Indeed, the Court rejected automatic death penalty statutes, see Woodson v. North Carolina, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976), in order to ensure that jurors remain conscious of the awesome responsibility involved when they determine whether a convicted murderer should live or die.
 
 
 116
 In the concluding paragraph of Part I, the majority declares that the prosecutor's remarks may have been intended "to comfort the jury that it was applying standards reflecting societal values, the remarks did not reduce the jury's sense of actual responsibility and authority for determining the appropriate penalty." Maj. op. at 1552. The proper focus, of course, is whether the comments, whatever their intent, "may incline them to approach their sentencing decision with less appreciation for the gravity of their choice and for the moral responsibility reposed in them as sentencers." California v. Ramos, 463 U.S. 992, 1011, 103 S.Ct. 3446, 3458, 77 L.Ed.2d 1171 (1983) (emphasis added). Clearly, a jury's moral responsibility in a capital murder case is the sine qua non of its sentencing decision. I cannot see how this attempt "to comfort them" had no effect on their sense of moral responsibility. It was a blatant attempt to distract them from it. If it was intended to comfort them, it was by dissuading them from the moral burden the law imposes on them. We cannot say, as the majority says, that the "remarks did not reduce the jury's sense of actual responsibility," maj. op. at 1552. We don't know that. We are required instead to determine that there is no possibility that the remarks reduced this sense of moral responsibility. One of the major themes persistent in Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), Gregg v. Georgia, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), and their progeny is that the jury's exercise of discretion, although limited by legislative guidelines, is necessary for a proper sentencing determination. See Woodson, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976); Jurek v. Texas, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976); Proffitt v. Florida, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976). A jury properly exercising its discretion in capital sentencing "maintain[s] a link between contemporary community values and the penal system--a link without which the determination of punishment could hardly reflect 'the evolving standards of decency that mark the progress of a maturing society.' " Witherspoon v. Illinois, 391 U.S. 510, 519 n. 15, 88 S.Ct. 1770, 1775 n. 15, 20 L.Ed.2d 776 (1968), quoting Trop v. Dulles, 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630 (1958).
 
 
 117
 In the sentencing process, the determination of the number and seriousness of aggravating circumstances is merely a guideline for the jurors, a benchmark for considering the death penalty. If the jury finds that aggravating circumstances outweigh mitigating circumstances, imposition of the death penalty is constitutionally permissible; however, under Oklahoma law, the jury may still exercise its discretion by refusing to impose the death penalty. Parks v. State, 651 P.2d 686, 694 (Okla.1982), cert. denied, 459 U.S. 1155, 103 S.Ct. 800, 74 L.Ed.2d 1003 (1983). Under this sentencing construct, the prosecutor's remarks are singularly invidious because his words create a mandatory sentencing scheme which attempts to strip the jury of the very discretion it may fully exercise up to the final moment when the verdict is decided.
 
 
 118
 Near the close of his argument in chief, the prosecutor in this case made the following remarks:
 
 
 119
 And then you may say, well, you know, yeah, I still mean it, I could, without doing violence to my conscience if this was a proper case; but, you know, I really don't want it on my hands that I had anything to do with anybody dying. So for that reason, although this is a proper case, I don't want to assess the death penalty because I just don't want to have to think about that. I don't want it on my conscience.
 
 
 120
 Well, I don't think it's on Robyn Parks' conscience that he took an innocent person's life away; and I don't believe in observing him throughout this trial and his testimony and listening to his voice on the tapes--I don't feel like there's the least bit of remorse in him over what he did. But, you know, as you as jurors, you really, in assessing the death penalty, you're not yourself putting Robyn Parks to death. You just have become a part of the criminal-justice system that says when anyone does this, that he must suffer death. So all you are doing is you're just following the law, and what the law says, and on your verdict--once your verdict comes back in, the law takes over. The law does all of these things, so it's not on your conscience. You're just part of the criminal-justice system that says when this type of type of [sic] thing happens, that whoever does such a horrible, atrocious thing must suffer death.
 
 
 121
 Now, that's man's law. But God's law is the very same. God's law says that the murderer shall suffer death. So don't let it bother your conscience, you know.
 
 
 122
 Record, vol. 6, at 707-08.
 
 
 123
 Such an argument was designed to do precisely what Caldwell specifically prohibits: allow the jurors to minimize their sense of personal responsibility for imposing the death sentence. By implying that the law affirmatively mandated the death penalty in this case, the prosecutor allowed the jurors to feel as if their hands were tied. He allowed them to feel as if they were not choosing to impose the death penalty, the law required it. In essence, he told the jurors that they were not responsible for sentencing Robyn Parks to death; the ephemeral "criminal justice system" was.
 
 
 124
 Portions of the prosecutor's argument merit repeating for illustration:
 
 
 125
 You just have become a part of the criminal-justice system that says when anyone does this, that he must suffer death.... [O]nce your verdict comes back in, the law takes over. The law does all of these things.... You're just part of the criminal-justice system that says when this type of type of [sic] thing happens, that whoever does such a horrible, atrocious thing must suffer death.
 
 
 126
 Record, vol. 6, at 707 (emphasis added). The prosecutor's remarks in this case are clearly improper because they diffuse the jurors' sense of responsibility for the death sentence by intimating that the jury is performing a dispassionate, mechanical, and ministerial, rather than discretionary function by "just following the law, and what the law says." Record, vol. 6, at 708.
 
 
 127
 The majority opinion finds the statements made in this case similar to those we found constitutional in both Dutton v. Brown, 812 F.2d 593 (10th Cir.1987) (en banc), and Coleman v. Brown, 802 F.2d 1227 (10th Cir.1986). Maj. op. at 1551. I strongly disagree and set out in the margin the challenged statements made in those cases for purposes of comparison.[3]
 
 
 128
 The prosecutor in Dutton attempted to define the juror's roles functionally, instead of individually, but did not minimize the juror's sense of responsibility within those roles. As for the remarks in Coleman, the prosecutor stressed that the defendant was responsible for his own plight but did not intimate that the awesome responsibility of imposing the death sentence did not rest solely with the jury. The statements made in the present case are much more troublesome because they are squarely directed at attempting to ameliorate any sense of accountability for the decision that this man must be executed.
 
 
 129
 Moreover, we found it critical in both Dutton and Coleman that the prosecutor made subsequent remarks stressing the importance and exclusivity of the jury's role in the sentencing determination. "It is clear that, when taken in context, the statement of the prosecutor was not constitutionally impermissible.... Indeed, the tenor of the remainder of the closing was that the crucial determination of punishment was the sole function of the jury." Dutton, 812 F.2d at 596-97 (emphasis added). In Coleman, we quoted the prosecutor's subsequent remarks at length. See Coleman, 802 F.2d at 1241. We found that "viewing [the Coleman] argument in context, it is evident that the prosecutor had no intention of diminishing the jury's sense of responsibility." Id. (emphasis added). In the present case, the prosecutor made no additional remarks that could have neutralized his impermissible comments. Essentially, he closed his argument-in-chief with the unconstitutional statements.
 
 
 130
 In addition, the court's instructions, although a correct statement of the law regarding juror responsibility, were buried in conventional boilerplate jury responsibility language. Moreover, the court in this case did not contemporaneously, or subsequently, effectively neutralize the prosecutor's impermissible remarks. As Chief Judge Holloway has so cogently noted in his concurring and dissenting opinion in which I fully concur, under Oklahoma procedure the trial court had a duty to do so after the prosecutor's remarks.
 
 
 131
 The Supreme Court's concluding statement in Caldwell is particularly applicable here:
 
 
 132
 This Court has always premised its capital punishment decisions on the assumption that a capital sentencing jury recognizes the gravity of its task and proceeds with the appropriate awareness of its "truly awesome responsibility." In this case, the State sought to minimize the jury's sense of responsibility for determining the appropriateness of death. Because we cannot say that this effort had no effect on the sentencing decision, that decision does not meet the standard of reliability that the Eighth Amendment requires.
 
 
 133
 Caldwell, 472 U.S. at 341, 105 S.Ct. at 2646 (emphasis added). The jury's verdict in this case is unreliable because it is possible that improper remarks have influenced its determination. Because I cannot say that the prosecutor's efforts to reduce the jury's sense of responsibility in this case had no effect on the jury's conducting of its task, I join in the majority's mandate for this reason as well as for the reason relied on by the majority.
 
 
 134
 STEPHEN H. ANDERSON, Circuit Judge, concurring and dissenting in part, with whom TACHA, BALDOCK, and BRORBY, Circuit Judges, join:
 
 
 135
 I concur in Part I of the majority opinion, but I disagree with the majority's holding on the instruction which tells the jury to avoid the arbitrary influence of emotions such as sympathy, sentiment, passion and prejudice.
 
 I.
 
 136
 The instruction in question, a general one following a series of more specific instructions, reads:"In arriving at your determination as to what sentence is appropriate under the law, you are authorized to consider all the facts and circumstances of this case whether presented by the State or the defendant and whether presented in the first proceeding or this sentencing proceeding.
 
 
 137
 "All of the previous instructions given you in the first part of this trial apply where applicable and must be considered along with these additional Instructions; together they contain all the law of any kind to be applied by you in this case, and the rules by which you are to weigh the evidence and determine the facts in issue. You must consider them all together, and not a part of them to the exclusion of the rest.
 
 
 138
 "You are the judges of the facts. The importance and worth of the evidence is for you to determine. You must avoid any influence of sympathy, sentiment, passion, prejudice, or other arbitrary factor when imposing sentence. You should discharge your duties as jurors impartially, conscientiously and faithfully under your oaths and return such verdict as the evidence warrants when measured by these Instructions.
 
 
 139
 "The Court has made rulings during the sentencing stage of this trial. In doing so, the Court has not expressed nor intimated in any way the conclusions to be reached by you in this case. The Court specifically has has (sic) not expressed any opinion as to whether or not any statutory aggravating circumstances exist, or whether or not any mitigating circumstances exist.
 
 
 140
 "You must not use any method of chance in arriving at a verdict but must base it on the judgment of each juror concurring therein.
 
 
 141
 "You have already elected a Foreman. Your verdict must be unanimous. Proper forms of verdict will be furnished you from which you shall choose one to express your decision. When you have reached a verdict, all of you in a body must return it into open Court.
 
 
 142
 "This law provides that you should now listen to and consider the further argument of counsel."
 
 
 143
 R. Vol. II, Instruction No. 9 (emphasis supplied).
 
 
 144
 The majority opinion proceeds on the premise that the jury focused on the word "any" in the sentence about passions, ignoring the words and sense of the sentence as a whole. Upon that very slight and hypertechnical premise the majority constructs large conclusions: that the instruction is unconstitutional on its face because it commands the jurors to denigrate mitigating circumstances evidence; that this general instruction overrides or otherwise nullifies the specific instructions on mitigating circumstances, as well as other specific instructions; and that California v. Brown, 479 U.S. 538, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987), does not apply since the instruction there used the word "mere" preceding the enumerated emotions.
 
 
 145
 The majority misconceives the sense of the instruction: A reasonable juror would not stop part way through the sentence in question (at "any ... sympathy") as the majority presumes. The sentence by its express terms refers to arbitrary factors ("any influence of sympathy, sentiment, passion, prejudice, or other arbitrary factor"). Thus, it sensibly cautions the jury against imposing sentence simply on the basis of arbitrary emotions. That is not qualitatively different from the meaning imparted by the instructions in Brown. In Brown the jury was directed not to divorce its considerations from the evidence and render an essentially whimsical decision based on mere sympathy. Here, the same directive is couched in terms of any arbitrary sympathy.
 
 
 146
 The context in which the sentence appears makes that clear. The next sentence in the instruction stresses impartiality. The preceding sentences state flatly that the jurors alone are the judges of the facts and that "the importance and worth of the evidence is for you to determine." Earlier, the jury was specifically instructed that it was not limited in any way in its consideration of mitigating circumstances:"You are further instructed that mitigating circumstances, if any, must also be considered by you, and although they are not specifically enumerated in the statutes of this State, the general law of Oklahoma and the United States sets up certain minimum mitigating circumstances for you to follow as guidelines in determining which sentence should be imposed in this case. You must consider all the following minimum mitigating circumstances and determine whether any one or more of them apply to all of the evidence, facts and circumstances of this case. You are not limited in your consideration to the minimum mitigating circumstances set out herein, and you may consider any other or additional mitigating circumstances, if any, that you may find from the evidence to exist in this case. What facts or evidence that may constitute an additional mitigating circumstance is for the jury to determine.
 
 
 147
 "The minimum mitigating circumstances are:
 
 
 148
 1. The defendant has no significant history of prior criminal activity;
 
 
 149
 2. The murder was committed while the defendant was under the influence of extreme mental or emotional disturbance;
 
 
 150
 3. The victim was a participant in the defendant's homicidal conduct or consented to the homicidal act;
 
 
 151
 4. The murder was committed under circumstances which the defendant believed to provide a moral justification or extenuation for his conduct;
 
 
 152
 5. The defendant was an accomplice in a murder committed by another person and his participation in the homicidal act was relatively minor;
 
 
 153
 6. The defendant acted under duress or under the domination of another person;
 
 
 154
 7. At the time of the murder the capacity of the defendant to appreciate the criminality (wrongfulness) of his conduct or to conform his conduct to the requirement of law was impaired as a result of mental disease or intoxication;
 
 
 155
 8. The age of the defendant at the time of the crime."
 
 
 156
 R. Vol. II, Instruction No. 6 (emphasis supplied).
 
 
 157
 Furthermore, all the instructions came after a sentencing proceeding in which the defendant's father testified about the defendant's character, friendly personality, and childhood circumstances, including the facts that the defendant was a product of a broken home and his father had served time in prison. And, the prosecution devoted its attention to the same sort of individualized evidence regarding Park's childhood, character and record, as well as the circumstances of the crime.
 
 
 158
 Under the circumstances, the reasoning in Brown to the effect that it is constitutional to instruct a jury not to be arbitrarily emotional applies directly to this case:
 
 
 159
 "Even a juror who insisted on focusing on this one phrase in the instruction would likely interpret the phrase as an admonition to ignore emotional responses that are not rooted in the aggravating and mitigating evidence introduced during the penalty phase. While strained in the abstract, respondent's interpretation is simply untenable when viewed in light of the surrounding circumstances. This instruction was given at the end of the penalty phase, only after respondent had produced 13 witnesses in his favor. Yet respondent's interpretation would have these two words transform three days of favorable testimony into a virtual charade. We think a reasonable juror would reject that interpretation, and instead understand the instruction not to rely on 'mere sympathy' as a directive to ignore only the sort of sympathy that would be totally divorced from the evidence adduced during the penalty phase.
 
 
 160
 "We also think it highly unlikely that any reasonable juror would almost perversely single out the word 'sympathy' from the other nouns which accompany it in the instruction: conjecture, passion, prejudice, public opinion, and public feeling. Reading the instruction as a whole, as we must, it is no more than a catalog of the kind of factors that could improperly influence a juror's decision to vote for or against the death penalty. The doctrine of noscitur a sociis is based on common sense, and a rational juror could hardly hear this instruction without concluding that it was meant to confine the jury's deliberations to considerations arising from the evidence presented, both aggravating and mitigating.
 
 
 161
 "An instruction prohibiting juries from basing their sentencing decisions on factors not presented at the trial, and irrelevant to the issues at the trial, does not violate the United States Constitution. It serves the useful purpose of confining the jury's imposition of the death sentence by cautioning it against reliance on extraneous emotional factors, which, we think, would be far more likely to turn the jury against a capital defendant than for him. And to the extent that the instruction helps to limit the jury's consideration to matters introduced in evidence before it, it fosters the Eighth Amendment's 'need for reliability in the determination that death is the appropriate punishment in a specific case.' Woodson, supra, 428 U.S., at 305, 96 S.Ct., at 2991. Indeed, by limiting the jury's sentencing considerations to record evidence, the State also ensures the availability of meaningful judicial review, another safeguard that improves the reliability of the sentencing process. See Roberts v. Louisiana, 428 U.S. 325, 335, and n. 11, 96 S.Ct. 3001, 3007, and n. 11, 49 L.Ed.2d 974 (1976) (opinion of Stewart, POWELL and STEVENS, JJ.)."
 
 
 162
 California v. Brown, 107 S.Ct. at 840 (emphasis supplied).
 
 II.
 
 163
 In her concurring opinion in Brown, Justice O'Connor identified a tension between two central principles of Supreme Court Eighth Amendment jurisprudence, stating:
 
 
 164
 "In Gregg v. Georgia, 428 U.S. 153, 189, 96 S.Ct. 2909, 2932, 49 L.Ed.2d 859 (1976), we concluded that 'where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action.' In capital sentencing therefore, discretion must be ' "controlled by clear and objective standards so as to produce nondiscriminatory application." ' Id., at 198, 96 S.Ct., at 2936 (quoting Coley v. State, 231 Ga. 829, 834, 204 S.E.2d 612, 615 (1974)). See also Proffitt v. Florida, 428 U.S. 242, 253, 96 S.Ct. 2960, 2967, 49 L.Ed.2d 913 (1976) (joint opinion of Stewart, POWELL, and STEVENS, JJ.) (State must provide 'specific and detailed guidance' to the sentencing body). On the other hand, this Court has also held that a sentencing body must be able to consider any relevant mitigating evidence regarding the defendant's character or background, and the circumstances of the particular offense. Eddings v. Oklahoma, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982); Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) (plurality opinion)."
 
 
 165
 California v. Brown, 107 S.Ct. at 841.
 
 
 166
 The tension described by Justice O'Connor, and considered by her in Brown, is reduced in this case because the instructions on mitigating evidence are much stronger. Under these instructions the jury was clearly informed that the listed mitigating circumstances were the minimum to be considered, and that the jury was entitled to consider any other or additional mitigating circumstances it found from the evidence to exist. The instructions went on to emphasize that "[w]hat facts or evidence that may constitute an additional mitigating circumstance is for the jury to determine."[1] It is simply not reasonable to assume, as does the majority opinion, that the jury would be led to denigrate this instruction, and further instructions regarding their exclusive right to judge the importance and worth of the evidence, because the judge also cautioned against being arbitrarily emotional. This is especially true in view of the fact that the entire sentencing proceeding was devoted to wide-ranging, unrestricted and wholly individualized evidence regarding Parks' character, record, upbringing, and the circumstances of the crime.[2]
 
 
 167
 The fallacy of the majority's assumption that the jury was likely to ignore mitigating evidence is evidenced by the verdict itself. The jury expressly rejected two of the three aggravating circumstances upon which the prosecution strenuously sought an affirmative jury finding: that the murder was especially heinous, atrocious or cruel; and, the probability that Parks would commit criminal acts of violence that would constitute a continuing threat to society. R. Vol. II, Instruction No. 1; Tr. Vol. V at 696-98, 734-35. That verdict necessarily resulted from the jury's individualized assessment of Parks based on the mitigating evidence.
 
 
 168
 The majority's slant toward a constitutional right to an emotional jury (neatly--and erroneously--translated from the context of arbitrary emotion into the more appealing concept of considered mercy), violates the principles of reasoned, channeled, reliable and reviewable sentences. A defendant's life should not hang on the ability or inability of defendant or lawyer to "move" the jury. Stated another way, the problem lies not so much with the life sentence imposed out of random sympathy, as with the death sentence imposed because the defendant or his lawyer were insufficiently articulate to generate sympathy. The focus in all cases is upon capriciousness in the imposition of the death penalty. In Booth v. Maryland, 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 44. (1987), the Supreme Court ruled that the introduction of a victim impact statement ("VIS") at the sentencing phase of a capital murder trial violated the Eighth Amendment. The Court's ruling rests partly on the facts that a VIS focuses on the victim rather than the defendant and serves only to inflame the jury and divert it from deciding the case on relevant evidence. Id. 107 S.Ct. at 2534, 2536. But the ruling also stresses that it is arbitrary to make sentencing decisions based on the ability of a family member to express his grief. Id. at 2534. The same principle applies to supplications by defendants and their lawyers.
 
 I agree with Justice O'Connor that:
 
 169
 "[T]he sentence imposed at the penalty stage should reflect a reasoned moral response to the defendant's background, character, and crime rather than mere sympathy or emotion."
 
 
 170
 California v. Brown 107 S.Ct. at 841. See also Franklin v. Lynaugh, --- U.S. ----, 108 S.Ct. 2320, 2333, 101 L.Ed.2d 155 (1988) (O'Connor, J., concurring). The requirement that sentencing decisions must be rational has been emphasized over and over again by the Supreme Court since Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972).
 
 
 171
 In Gardner v. Florida, 430 U.S. 349, 358, 97 S.Ct. 1197, 1204, 51 L.Ed.2d 393 (1976), the Court stated: "It is of vital importance to the defendant and to the community that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion." That standard has been referred to repeatedly by the Court in its later decisions. Sumner v. Shuman, 483 U.S. 66, 107 S.Ct. 2716, 2723, n. 5, 97 L.Ed.2d 56 (1987) ("sentence imposed at the penalty stage should reflect a reasoned moral response to the defendant's background, character, and crime" quoting California v. Brown, 107 S.Ct. at 841 (O'Connor, J., concurring)); Booth v. Maryland, 107 S.Ct. at 2536 ("[A]ny decision to impose the death sentence must 'be, and appear to be, based on reason rather than caprice or emotion.' ", quoting Gardner v. Florida, 430 U.S. at 358, 97 S.Ct. at 1204; "reasoned decision making" required in capital cases); McCleskey v. Kemp, 481 U.S. 279, 107 S.Ct. 1756, 1789, 95 L.Ed.2d 262 (1987) ("[W]e have demanded a uniquely high degree of rationality in imposing the death penalty." (Brennan, J., dissenting)); Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985) ("[M]any of the limits that this Court has placed on the imposition of capital punishment are rooted in a concern that the sentencing process should facilitate the responsible and reliable exercise of sentencing discretion." Id. at 329, 105 S.Ct. at 2639; "[T]his Court has gone to extraordinary measures to insure that the prisoner sentenced to be executed is afforded process that will guarantee, as much as is humanly possible, that the sentence was not imposed out of whim, passion, prejudice, or mistake." Id. at 329, n. 2, 105 S.Ct. at 2639 n. 2, quoting Eddings v. Oklahoma, 455 U.S. 104, 118, 102 S.Ct. 869, 878, 71 L.Ed.2d 1 (1982) (O'Connor, J., concurring)); Pulley v. Harris, 465 U.S. 37, 53, 104 S.Ct. 871, 880, 79 L.Ed.2d 29 (1984) (upholding the constitutionality of a state statute which guaranteed that the jury's discretion will be guided and its consideration "deliberate"); California v. Ramos, 463 U.S. 992, 1018-21, 103 S.Ct. 3446, 3462-64, 77 L.Ed.2d 1171 (1983) (Marshall, J., dissenting) (capital punishment decisions must be "rational," "meaningful," "principled," and "reliable"); Godfrey v. Georgia, 446 U.S. 420, 433, 100 S.Ct. 1759, 1767, 64 L.Ed.2d 398 (1980) (death sentence must be based on reason rather than caprice or emotion, quoting Gardner v. Florida, 430 U.S. at 358, 97 S.Ct. at 1204); Beck v. Alabama, 447 U.S. 625, 637-38, 100 S.Ct. 2382, 2389-90, 65 L.Ed.2d 392 (1980) (reason rather than caprice or emotion required); Gregg v. Georgia, 428 U.S. 153, 190, 96 S.Ct. 2909, 2933, 49 L.Ed.2d 859 (1976) ("reasoned determination" by a jury); Jurek v. Texas, 428 U.S. 262, 274, 96 S.Ct. 2950, 2957, 49 L.Ed.2d 929 (1976) (Texas procedure "guides and focuses the jury's objective consideration of the particularized circumstances of the individual offense and the individual offender.") (emphasis supplied); Proffitt v. Florida, 428 U.S. 242, 259, 96 S.Ct. 2960, 2969, 49 L.Ed.2d 913 (1975) ("[T]here shall be an informed, focused, guided, and objective inquiry into the question whether [a convicted person] should be sentenced to death.").
 
 
 172
 Indeed, the only circuit decision on point since Brown upholds the constitutionality of an absolute antisympathy instruction, essentially pointing to the reasoning in Brown that "a rational juror could hardly hear this instruction without concluding that it was meant to confine the jury's deliberations to considerations arising from the evidence presented, both aggravating and mitigating." Byrne v. Butler, 847 F.2d 1135, 1140 (5th Cir.1988) (quoting California v. Brown, 107 S.Ct. at 840). Since the instruction in this case before us is not an absolute antisympathy instruction, the majority's disagreement with the Fifth Circuit goes farther than splitting the circuits, it represents an extreme position lacking any support at all in existing cases. The majority's emphasis on the role of emotion is nothing less than a return to standardless and whimsical capital sentencing. It is important to stress again that a jury, especially one that previously sat through the guilt or innocence stage of the trial and found the defendant guilty of murder, is more likely to have sympathy for the victim and the victim's family than for the defendant. Thus, an instruction like that in question is more apt to help than to harm defendants.
 
 III.
 
 173
 The majority opinion makes no holding on the question of the influence of the prosecutor's statements regarding sympathy. I do not regard them, either alone or in combination with Instruction No. 9, as rendering the jury's sentence constitutionally defective. The overriding reason is discussed in the foregoing sections: the jury instructions clearly guided the jury with respect to its role and power in general, and with respect to mitigating circumstances in particular. The court made it absolutely clear to the jury that the instructions, not comments by counsel, contained the law, and that the jurors were the sole judges of the facts and the court the sole judge of the law, Tr. Vol. I at 67-68, Tr. Vol. II at 179; Tr. Vol. V at 660; R. Vol. II, Court's Explanation of Instructions, Instructions 2, 6, and 9.
 
 
 174
 Furthermore, the prosecutor's few references to sympathy and prejudice were combined with references to the jurors' right to consider anything in mitigation (Tr. Vol. V at 703-04), and duty to return a verdict under the law and the evidence (Id. at 730). Finally, the prosecutor's comments responded to fervent appeals to generalized sympathy by Parks' counsel. Those appeals were based largely upon emotion-generating matters wholly irrelevant to the type of individualized evidence of the defendant's character, record and circumstances of the crime, referred to in the cases cited by the majority: Skipper v. South Carolina, 476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986); Zant v. Stephens, 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983); Eddings v. Oklahoma, 455 U.S. at 104, 102 S.Ct. at 871; Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978); and Woodson v. North Carolina, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976).
 
 
 175
 Thus, for example, Parks' counsel dwelt on his own experiences in Vietnam, and the death of his buddies, Tr. Vol. V at 708-09, 711 ("I've had to put some of my friends in plastic bags...."), as well as the tragedy of his own terminal illness ("I understand that feeling [having your days numbered] very well myself because I've suffered a serious disease and I very well might not be around much longer...." Id. at 718). Those are appeals to arbitrary sympathy (just as were the prosecutor's passionate remarks seeking sympathy for the victim and his family). It was justifiable to respond to such appeals by referring the jury to the court's instruction cautioning against the influence of arbitrary emotions.
 
 IV.
 
 176
 Borrowing from the Supreme Court's language in Brown, it is utterly implausible that a reasonable juror would almost perversely single out the word "any" buried in a general instruction, to the exclusion of the sense of the entire instruction, and rely upon it to disregard the court's specific and unequivocal instructions on mitigating circumstances evidence.
 
 
 177
 Judicial exercises in semantic metaphysics aside, what it boils down to is this: Did the instructions and proceedings as a whole direct these jurors to deliberate reasonably and impose a sentence based on all the evidence? An affirmative answer to that question is unavoidable. There is no substantial possibility[3] that Instruction No. 9, either alone or in combination with remarks by the prosecutor, prevented "the sentencing jury from giving mitigating effect to any evidence relevant to petitioner's character or background or to the circumstances of the offense." Franklin v. Lynaugh, 108 S.Ct. at 2335 (O'Connor, J., concurring).
 
 
 
 [1]
 The sentencing jury rejected the other two aggravating factors alleged by the state: that defendant would probably commit crimes in the future, thus posing "a continuing threat to society," and that the murder was "especially heinous, atrocious or cruel."
 
 
 [2]
 Although petitioner's trial counsel did not raise these issues as objections at trial, we nevertheless may consider them because the Oklahoma Court of Criminal Appeals reviewed them on direct appeal. See Parks v. State, 651 P.2d 686, 693 (Okla.Crim.App.1982). "If a state court has reached the merits of a claim, a federal habeas court may do the same despite the existence of a state procedural bar." Andrews v. Shulsen, 802 F.2d 1256, 1266 n. 8 (10th Cir.1986), cert. denied, 481 U.S. 1033, 107 S.Ct. 1964, 95 L.Ed.2d 536 (1987). Although the prosecutor's remarks were only reviewed for "fundamental prejudice," that constitutes a sufficient decision on the merits by the state court. See Morishita v. Morris, 702 F.2d 207, 209 (10th Cir.1983) (review for "fundamental fairness" by state court was a decision on the merits)
 
 
 [3]
 The Court identified four dangers associated with such statements: (1) jurors might not understand that appellate courts are limited in their ability to review sentencing decisions; (2) the jury might be more willing to impose the death sentence as a sign of disapproval of the defendant's acts if they thought that any error could be corrected on appeal; (3) jurors, correctly assuming that a sentence of life in prison cannot be increased on appeal whereas a death sentence can be reduced if the appeals court desires, might impose the death penalty as a way of delegating the penalty decision; and (4) jurors might minimize the importance of their role and vote to impose the death penalty even if they were undecided. Caldwell, 472 U.S. at 330-33, 105 S.Ct. at 2640-42
 
 
 [4]
 Darden appears to require an element of misleading before Caldwell is violated, even though one of the dangers discussed in Caldwell did not involve any element of misleading or confusion. See footnote 3, supra. However, we need not determine whether a statement must be misleading before Caldwell is violated, nor do we need to decide whether the prosecutor's statements here were, in fact, misleading because of our threshold holding that Caldwell applies only to statements that diminish a jury's sense of its role in deciding whether to impose the death penalty and we have found no such statements here
 
 
 [5]
 Because we find that Caldwell is not implicated in this case as a threshold matter, we need not decide whether the effect of the statements on the jury was sufficient to deny petitioner his eighth amendment rights, nor do we address here the appropriate standard of review to evaluate the effect upon the jury of a Caldwell-violative statement
 
 
 [6]
 Apparently the defense counsel had participated in the enactment of Oklahoma's death penalty statute
 
 
 [7]
 Those remarks are similar to the statements by the prosecutor in this case that the jurors were "not [themselves] putting Robyn Parks to death" but were just "part of the criminal justice system."
 
 
 [8]
 The full instruction, Instruction # 9 in the Penalty Trial, provided:
 In arriving at your determination as to what sentence is appropriate under the law, you are authorized to consider all the facts and circumstances of this case whether presented by the State or the defendant and whether presented in the first proceeding or this sentencing proceeding.
 All of the previous instructions given you in the first part of this trial apply where applicable and must be considered along with these additional Instructions; together they contain all the law of any kind to be applied by you in this case, and the rules by which you are to weigh the evidence and determine the facts in issue. You must consider them all together, and not a part of them to the exclusion of the rest.
 You are the judges of the facts. The importance and worth of the evidence is for you to determine. You must avoid any influence of sympathy, sentiment, passion, prejudice, or other arbitrary factor when imposing sentence. You should discharge your duty as jurors impartially, conscientiously and faithfully under your oaths and return such verdict as the evidence warrants when measured by these Instructions.
 The Court has made rulings during the sentencing stage of this trial. In doing so, the Court has not expressed nor intimated in any way the conclusions to be reached by you in this case. The Court specifically has not expressed any opinion as to whether or not any statutory aggravating circumstances exist, or whether or not any mitigating circumstances exist.
 You must not use any method of chance in arriving at a verdict but must base it on the judgment of each juror concurring therein.
 
 
 [9]
 Judge Anderson's dissent reads the instruction as telling the jury only "to avoid the arbitrary influence of emotions such as sympathy, sentiment, passion, and prejudice." (Emphasis added.) However, that is not the way we read the instruction. It commands the jury to "avoid any influence of sympathy ... or other arbitrary factor." (Emphasis added.) The word "arbitrary" does not modify "influence." Rather, it modifies "factor," indicating that any "sympathy," even when based on the evidence, is an arbitrary factor which should be completely disregarded by the jury. We do not believe it is "hypertechnical" to examine the elements of an instruction that informs a sentencing jury what it may not consider in making a decision on the death penalty. The word "any" is an important part of the instruction in this case. By giving weight to the adjective used by the instructing court, we are no more technical than the Supreme Court was in Brown when it focused on the word "mere."
 
 
 [10]
 In fact, the State in Brown acknowledged that the jury may consider sympathy for the defendant that is related to the evidence. The state merely argued that "untethered sympathy" that was unrelated to the circumstances of the offense or the defendant should not be considered. Brown, 479 U.S. at 548, 107 S.Ct. at 843 (Brennan, J., dissenting)
 
 
 [11]
 We do not read these statements to be central to the Court's reasoning. The Court was careful to state that it was the existence of the adjective "mere" that was "the crucial fact" underlying its decision. 479 U.S. at 542, 107 S.Ct. at 840
 
 
 [12]
 We recognize that our holding is at odds with the recent decision by the Fifth Circuit in Byrne v. Butler, 847 F.2d 1135 (5th Cir.1988). That court affirmed and adopted a district court's holding that a general anti-sympathy instruction did not violate a defendant's constitutional rights. The district court stated that the qualifier "mere," which modified the word "sympathy" in California v. Brown, was not needed to avoid a constitutional violation. 847 F.2d at 1139. We believe that the district court and the Fifth Circuit treated the Supreme Court's emphasis in Brown of the word "mere" too lightly. Our reading of Brown indicates to us that the Supreme Court recognized that sympathy grounded upon mitigating evidence may be considered by the jury. The Fifth Circuit's holding would eliminate such consideration
 
 
 [13]
 Judge Anderson's dissent suggests that we are "slant[ing] toward a constitutional right to an emotional jury." The dissent confuses our support for Robyn Parks' right to appeal to the sentencing jury's compassion, mercy, and sympathy based on the evidence, which is well grounded in the Supreme Court's jurisprudence, with a support for untethered emotion, which we do not intend by our opinion
 
 
 [14]
 At least one court of appeals has held that similar statements by a prosecutor are unconstitutional. See Drake v. Kemp, 762 F.2d 1449, 1460 (11th Cir.1985) (prosecutor's anti-mercy statements were improper; mercy is one of the jury's "most central sentencing considerations, the one most likely to tilt the decision in favor of life"), cert. denied, 478 U.S. 1020, 106 S.Ct. 3333, 92 L.Ed.2d 738 (1986)
 
 
 [15]
 The federal habeas statute empowers the federal courts to dispose of the matter "as law and justice require." 28 U.S.C. Sec. 2243; Chaney v. Brown, 730 F.2d 1334, 1358 (10th Cir.), cert. denied, 469 U.S. 1090, 105 S.Ct. 601, 83 L.Ed.2d 710 (1984)
 
 
 [16]
 Before 1985, Oklahoma courts held that they lacked the authority to order a resentencing proceeding before a new jury because 21 Okla.Stat. Sec. 701.10 (1981) mandated that a capital sentencing proceeding be conducted before the same jury that determined the defendant's guilt. See, e.g., Chaney v. Brown, 699 P.2d 159 (Okla.Crim.App.1985); Johnson v. State, 665 P.2d 815, 826-27 (Okla.Crim.App.1982). Therefore, when errors in sentencing in capital cases were found, death sentences would be modified to life imprisonment. Effective July 16, 1985, the Oklahoma Legislature amended section 701.13(E) to authorize remanding a capital case for resentencing. See 21 Okla.Stat.Ann. Sec. 701.13(E) (West Supp.1988). We are aware that the Oklahoma Court of Criminal Appeals has held that retroactive application of the amended statute would be unconstitutional under the Federal and Oklahoma constitutions, Dutton v. Dixon, 757 P.2d 376 (Okla.Crim.App.1988), and that the relevant dates for this ex post facto problem are the date the offense was committed and the date the statute became effective. Bromley v. State, 757 P.2d 382, 388 (Okla.Crim.App.1988). However, the manner in which the State of Oklahoma chooses to resentence petitioner is not now before us and we express no view on the issue
 
 
 [1]
 These arguments included the statements that the jurors had become "a part of the criminal justice system that says when anyone does this, that he must suffer death ... [O]nce your verdict comes back in, the law takes over. The law does all of these things.... You're just part of the criminal-justice system that says when this type of [sic] thing happens, that whoever does such a horrible, atrocious thing must suffer death."
 The prosecutor further stated: "Now, that's man's law. But God's law is the very same. God's law says that the murderer shall suffer death. So don't let it bother your conscience, you know." (Record Vol. 6 at 707-08.).
 
 
 [1]
 See my dissent in Parks v. Brown, 840 F.2d 1496 (10th Cir.1987), for a discussion of the distinction between an ordinary murder and one which is appropriately considered for capital punishment
 
 
 [2]
 For instance, traditionally sentencing and the disposition of offenders have been functions of the trial court. In these matters, the court has considerably more experience than members of the jury
 
 
 [3]
 The challenged statements in Dutton were as follows:
 First of all, [Defense Counsel] argues that the final decision is yours, and of course, to some degree it is. But you are, as I am, as Judge Theus is, as all the courts are, part of the process. We are not functioning as individuals. I am not here as Andy Coats. I am here as the District Attorney.
 And you are not here in your individual capacities. You are here as the jury. And Judge Theus is not our good friend, Harold, off the Bench. He is his Honor, Judge Harold Theus, when he is in this Courtroom.
 And we are all part of the law and it is the law that makes us work. So it has to be in that attitude, in that frame of mind, that you approach the problem.
 Dutton, 812 F.2d at 596.
 The challenged statements in Coleman were as follows:
 In closing I say to you that they try to put the responsibility on you, like it's all your fault. To a certain extent--I don't mean to imply, I don't mean to imply that it's put on you like it's your fault if you do something in this case. I don't mean to imply that necessarily, but let me make it real clear that you're not writing the verdict in this case. Don't--don't be mistaken into believing that it's your responsibility that this happened, that you're, you're writing the verdict. I, I say to you, this man wrote the verdict on February 9th, and all those days after when he got out of jail and went on [sic] spree of knifing and kidnapping and killing. He wrote the verdict. This man. He wrote it in blood over and over.
 Coleman, 802 F.2d at 1240.
 
 
 [1]
 The instruction was reinforced by Instruction No. 8, and the verdict form, which told the jury it was required to reduce to writing any aggravating circumstances it found but was not required to reduce to writing or otherwise explain any mitigating circumstances it found
 
 
 [2]
 The Court emphasized to Parks' counsel that, "[Y]ou put on whatever evidence you want in mitigation." Tr. Vol. V at 659
 
 
 [3]
 I use this standard because it is the one relied upon in the majority opinion